**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PATRICIA FAULKNER**<br>1307 Fieldstead Lane,<br>Lancaster, Pennsylvania 17603<br>Plaintiff, | : | NO. |
| v. | : | |
| **EUROFINS LANCASTER LABORATORIES ENVIRONMENT TESTING, LLC.,**<br>2425 New Holland Pike,<br>Lancaster, Pennsylvania 17601<br>Defendant. | : | **JURY TRIAL DEMANDED** |

## COMPLAINT

AND NOW, Plaintiff, Patricia Faulkner ("Plaintiff"), by and through her undersigned counsel, for her Complaint against Eurofins Lancaster Laboratories Environment Testing, LLC., ("Defendant"), alleges as follows:

## INTRODUCTION

1. Plaintiff brings this action to redress violations by Defendant of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq*. As a result, Plaintiff has suffered damages as set forth herein.

## PARTIES

2. Plaintiff, Patricia Faulkner, is a citizen of the United States and Pennsylvania, where she currently maintains an address at 1307 Fieldstead Lane, Lancaster, Pennsylvania 17603.

3. Defendant, Eurofins Lancaster Laboratories Environment Testing, LLC., is a foreign limited liability company organized and existing under the laws of the State of Delaware

authorized to conduct business in the Commonwealth of Pennsylvania, with a principal place of business located at 2425 New Holland Pike, Lancaster, Pennsylvania 17601.

**JURISDICTION AND VENUE**

4. Paragraphs 1 through 3 are hereby incorporated by reference as though the same were set forth at length herein.

5. On or about December 1, 2025, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dually filed with the Pennsylvania Human Relations Commission ("PHRC"), thereby satisfying the requirements of 42 U.S.C. § 2000e-5(b) and (e), and 43 P.S. § 959(a). Plaintiff's EEOC Charge was docketed as EEOC Charge No. 530-2026-01660. Plaintiff's EEOC Charge was filed within one hundred and eighty (180) days of the unlawful employment practice.

6. By correspondence dated July 13, 2026, Plaintiff received a Notice of Right to Sue from the EEOC regarding her charge, advising Plaintiff that she had ninety (90) days to file suit against Defendant.

7. Plaintiff filed the instant action within the statutory time frame applicable to her federal claims.

8. Although one (1) year has not passed since Plaintiff dual filed her Charge with the EEOC and the PHRC, courts in this Circuit have adopted a flexible approach to the PHRA exhaustion by permitting plaintiffs to maintain PHRA claims if the one (1) year deadline expires during the court proceedings. O'Malley v. Dowd Marketing, Inc., No. 17-cv-1419, 2018 WL 6313616, at *10-11 (M.D. Pa. Nov. 15, 2018) (citations omitted).

9. Plaintiff has therefore exhausted her administrative remedies and has complied with all conditions precedent to maintain this action.

10. This is an action authorized and instituted pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*.

11. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as it is a civil rights action arising the laws of the United States.

12. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims arise out of the same common nucleus of operative fact as her federal claims.

13. The venue in this district is proper pursuant to 28 U.S.C. § 1391(b), as the unlawful practices of which Plaintiff is complaining were committed in the Commonwealth of Pennsylvania in this judicial district.

**FACTUAL BACKGROUND**

14. Paragraphs 1 through 13 are hereby incorporated by reference as though the same were fully set forth at length herein.

15. By way of background, Plaintiff has a medical condition called gender dysphoria.

16. Gender dysphoria is a disability within the meaning of the ADA/PHRA because it substantially limits one or more major life activity, including but not limited to interacting with others, and social and occupational functioning, and it substantially limits one or more major bodily functions, including, but not limited to reproduction and using the restroom.

17. By way of further background, Plaintiff was employed with Eurofins Environment Testing in Cleveland, Ohio as a Scientific Director, where Plaintiff oversaw testing of samples for pollutants.

18. Plaintiff's position changed when she chose to move from Ohio to Pennsylvania.

19. Plaintiff began her employment at Defendant's Lancaster, Pennsylvania location in or around November 2023 as a Scientific Director.

20. Plaintiff remained in an advisory role, but Plaintiff did not oversee any subordinates anymore; this was a lateral transfer.

21. Because Plaintiff's position required use of a lab, Plaintiff was required to be in office full time and was not given the option to work from home.

22. Her position as Scientific Director included the oversight of PFAS (per- and polyfluoroalkyl substances) projects.

23. On or about October 29, 2024, Plaintiff emailed Rick Karam ("Mr. Karam"), Plaintiff's Direct Supervisor for Defendant, and Christine Ratcliff ("Ms. Ratcliff"), another Director at Defendant who served in a lateral but quasi-advisory role to Plaintiff, that she would be using FMLA leave for a surgery.

24. Plaintiff reached out to Human Resources ("HR") to ask about using FMLA leave and what paperwork was required for her to go on leave.

25. When Plaintiff filled out the FMLA paperwork, Plaintiff indicated that she would use the FMLA leave for a medically necessary vaginoplasty surgery beginning on or about February 24, 2025.

26. By way of background, a vaginoplasty is a vagina reconstruction surgery used to repair or construct tissue in the vaginal canal, and this surgery was necessary for Plaintiff's gender dysphoria.

27. Additionally, vaginoplasty surgeries require an extensive recovery period due to the post-operative care.

28. Plaintiff's surgery required a three-day hospital stay, followed by bed rest and medical treatments four (4) times per day for nearly a month and a half.

29. Plaintiff was expected to be on medical leave to recover from surgery until April 6, 2025, when Plaintiff would be able to return to work.

30. Neither Mr. Karam nor Ms. Ratcliff responded to this email containing Plaintiff's request for leave.

31. Plaintiff continued to remind Mr. Karam and Ms. Ratcliff of her upcoming FMLA leave in meetings.

32. Mr. Karam and Ms. Ratcliff acknowledged Plaintiff's upcoming leave and did not mention that the dates were an issue.

33. After Plaintiff's surgery and during her recovery period, Plaintiff experienced complications that required Plaintiff to extend her FMLA leave.

34. Initially, Plaintiff believed her complications would only require her to extend her FMLA leave by one (1) week, which would have made Plaintiff's return to work date April 14, 2025.

35. On or about March 26, 2025, Plaintiff emailed Mr. Karam, Ms. Ratcliff, and Jonathan Thorn ("Mr. Thorn"), a Technical Director, that Plaintiff would need the first additional week extension, taking Plaintiff's leave through April 14, 2025.

36. Plaintiff also informed them of the possibility that she would need an additional week or two (2) of recovery time based on her doctor's advice.

37. On or about April 10, 2025, Plaintiff returned to see Thomas Arnold ("Mr. Arnold"), the Physician Assistant to Plaintiff's surgeon, Christine McGinn (Dr. McGinn), for a post-operative follow-up.

38. Mr. Arnold and Dr. McGinn determined that Plaintiff should not return to work until April 28, 2025, which extended Plaintiff's FMLA leave by an additional two (2) weeks.

39. On or about April 11, 2025, Plaintiff emailed Mr. Karam, Ms. Ratcliff, and Mr. Thorn of her need for an additional two (2) weeks for recovery.

40. Throughout Plaintiffs' FMLA leave, Plaintiff accessed her email only for the purposes of updating Mr. Karam, Ms. Ratcliff, and Mr. Thorn of the status of her leave and if Plaintiff needed an extension.

41. On or about April 28, 2025, Plaintiff returned to work.

42. The interactions with some of Defendant's employees began to indicate to Plaintiff that Defendant was phasing Plaintiff out after her return from FMLA leave.

43. Ms. Ratcliff stopped speaking to Plaintiff completely—except for greetings in passing—and would not interact with Plaintiff, contrary to their friendly and collaborative relationship before Plaintiff took FMLA leave.

44. Plaintiff was supposed to meet with Mr. Karam and Ms. Ratcliff upon her return to work to be caught up on the projects Plaintiff was tasked with overseeing.

45. Mr. Karam told Plaintiff to "catch up on trainings, E-mail, etc." until Plaintiff could meet with both of them, but Mr. Karam did not give her any update on any projects.

46. Mr. Karam and Ms. Ratcliff continued to delay meetings with Plaintiff, leaving Plaintiff unaware of what projects or work were going on with in her purview.

47. These joint meetings, which had occurred regularly prior to Plaintiff's FMLA leave, ultimately stopped.

48. On or about April 30, 2025, Charl Du Preez ("Mr. Du Preez"), Defendant's President, scheduled a meeting with Plaintiff to discuss her return to work.

49. In this meeting, Mr. Du Preez spoke with Plaintiff about a position opening at Eurofins Environment Testing in Cleveland, Ohio.

50. Mr. Du Preez encouraged Plaintiff to apply for the role in Ohio, despite Plaintiff never having expressed interest in returning to Cleveland or finding a new position with Defendant.

51. Upon information and belief, the position available in Ohio would have been a demotion from Plaintiff's current position.

52. Upon information and belief, Rayna Nolen ("Ms. Nolen"), in charge of overseeing the PFAS Department in Cleveland, Ohio, informed Plaintiff that the position available in Cleveland would provide less opportunities to grow at the company, less projects to oversee, and has less similarities overall to Plaintiff's position with Defendant.

53. In response, Plaintiff told Mr. Du Preez she considered Lancaster her home and had no plans to move again.

54. On or about May 6, 2025, Mr. Karam scheduled a meeting with Plaintiff to discuss the possibility that Plaintiff's position would be eliminated, which was unexpected.

55. Mr. Karam stated that Defendant did not need a director role anymore.

56. Mr. Karam also informed Plaintiff that Defendant did not have the finances to support Plaintiff's role.

57. Upon information and belief, this is not true, as Defendant began the hiring process for two additional employees with similar roles while Plaintiff was out on FMLA leave.

58. In approximately May 2025, Defendant hired Brianna Henriquez ("Ms. Henriquez") as an Environmental Testing Leader in a "Director of Specialty Services" role.

59. In approximately May 2025, Defendant also hired Stephen Somerville ("Mr. Somerville") as a PFAS Technical Director in a "Technical Director" role.

60. Additionally, the first time Plaintiff heard about any budget issues was at Defendant's "Town Hall" meeting on or about May 14, 2025, which was shortly after Plaintiff returned from FMLA leave.

61. During the aforementioned meeting, Mr. Du Preez indicated Defendant was under budget on personnel, contradicting Mr. Karam's prior statement during their meeting shortly after Plaintiff returned from FMLA leave.

62. Plaintiff believed the statement that Defendant could not financially support Plaintiff's role was not true and was being offered as a pretextual reason for Plaintiff's elimination from the company.

63. On or about May 6, 2025, after Defendant's meeting with Mr. Karam, Plaintiff emailed Ms. Ratcliff asking if she had time to meet to talk about the potential restructuring of Plaintiff's responsibilities if Plaintiff chose to stay at Defendant rather than opt to transfer to Cleveland, Ohio.

64. Ms. Ratcliff responded saying, "I do not. [Mr. Karam] is your direct report, and I do not know what he has in mind. You would need to discuss with him. . . ."

65. Ms. Ratcliff's response surprised Plaintiff because it was a vastly different form of communication than their typical communications and relationship prior to Plaintiff's FMLA leave.

66. On or about May 12, 2025, Plaintiff asked Mr. Karam for an estimated timeline of when to expect her responsibilities with her current role to end, as Plaintiff's future with the company was unclear.

67. Mr. Karam did not respond to this email.

68. On or about May 20, 2025, Plaintiff emailed Mr. Karam about a project Plaintiff was overseeing.

69. Plaintiff asked Mr. Karam if he wanted her to hand off the project upgrade to Hannah Kruelle ("Ms. Kruelle"), a Principal Chemist in the PFAS Department before Plaintiff changed positions and/or was terminated.

70. Mr. Karam responded affirmatively.

71. At another date, Mr. Karam told Plaintiff a project she oversaw prior to taking her FMLA leave was being transferred to Joseph Anderson ("Mr. Anderson"), a Principal Scientist for Defendant, because Plaintiff was "out longer than expected," referencing Plaintiff's absence due to FMLA leave.

72. On or about May 22, 2025, Plaintiff emailed Austin Prince ("Mr. Prince"), a PFAS Manager, Mr. Thorn, Ms. Ratcliff, Christine Dolman ("Ms. Dolman"), and Anthony Polaski ("Mr. Polaski") to ask about updates on a project Plaintiff oversaw and next steps moving forward.

73. No one on this email chain responded to Plaintiff's email.

74. On or about May 29, 2025, Taryn McKnight ("Ms. McKnight"), a PFAS Practice Leader in the Eurofins Environment Testing location in Sacramento, California, held a "PFAS Operations Status and Development Call" via Microsoft Teams.

75. By way of background, the PFAS Operations Status and Development Call was a long-running, regular meeting in which Plaintiff was heavily involved since joining Defendant's Ohio location prior to joining Defendant in its Lancaster office.

76. There were twenty-five (25) invitees for the meeting, including Mr. Karam, Ms. Ratcliff, Mr. Thorn, and Mr. Du Preez, but Ms. McKnight did not include Plaintiff in the meeting invitation, despite Plaintiff's heavy involvement and oversight with PFAS operations.

77. On or about June 10, 2025, Plaintiff messaged Mr. Prince via Microsoft Teams to ask about the status of a project Plaintiff oversaw.

78. Mr. Prince responded to inform Plaintiff that Ms. Henriquez and Mr. Sommerville "took over the project" and that the staff had "made progress under their direction."

79. Plaintiff interpreted this also to mean that the statement from Defendant that it did not need a director role anymore was false, as the two were clearly operating in their director capacities over projects that were within Plaintiff purview prior to Plaintiff's FMLA leave.

80. On or about June 16, 2025, Plaintiff became suspicious that Ms. Henriquez and Mr. Somerville were taking over Plaintiff's job responsibilities.

81. On June 16, 2025, Ms. Henriquez emailed Plaintiff to ask for help with a project that used to be within Plaintiff purview prior to Plaintiff's FMLA leave regarding who to speak to for training on the procedures and tools.

82. Ms. Henriquez did not ask for Plaintiff's help; she only asked for contact information from another individual to train her.

83. On or about July 1, 2025, Plaintiff checked in with Mr. Thorn, Ms. Henriquez, Mr. Somerville, Mr. Prince, and Ms. Ratcliff about updates for a project Plaintiff oversaw.

84. No one on this email chain responded to Plaintiff about the project at all.

85. On or about July 3, Plaintiff logged on to FIX Team, a confluence group, to access Plaintiff's team page.

86. Plaintiff received a message stating, "You don't have access to eurofinxfix.atlassian.net" which indicated to Plaintiff that she was being removed from all projects for which Plaintiff's team was responsible.

87. In or about July 2025, with Mr. Karam's approval, Plaintiff began remotely supporting the Cleveland, Ohio office on some projects, as Defendant effectively phased Plaintiff out of all of her projects and failed to provide Plaintiff with additional work.

88. Defendant got rid of Plaintiff's personal office and transferred Plaintiff to a cubicle area in the lower floor of Plaintiff's office in a completely separate group's office space.

89. Defendant cited the reason for removing Plaintiff from her office was to "make room for management" in this space, but Plaintiff was further away from everyone with whom Plaintiff had previously worked.

90. This transfer indicated to Plaintiff another way for Defendant to phase Plaintiff out and seemed to indicate a demotion.

91. Plaintiff began to work from home since she was supporting Cleveland.

92. Plaintiff was still allowed to use Defendant's office Lancaster office to use lab equipment when needed, which was very little.

93. This was a complete departure from Plaintiff's role at the Lancaster location to that point, indicating to Plaintiff that Defendant did not intend to ever give Plaintiff work within her normal responsibilities again.

94. On or about July 29, 2025, Mr. Karam called Plaintiff to give her notice that her position would be removed within the month.

95. Mr. Karam told Plaintiff that Defendant could offer her a demotion to a production-focused role with a lower compensation rate.

96. Plaintiff informed Mr. Karam that she was not interested in the production role at Defendant.

97. On or about August 7, 2025, Plaintiff met with Mr. Karam.

98. Mr. Karam again informed Plaintiff that Defendant's plan was to either offer Plaintiff a demotion to a production-focused role or to terminate Plaintiff's position, effective August 22, 2025.

99. Plaintiff told Mr. Karam she was not interested in accepting a demotion.

100. In response, Mr. Karam told Plaintiff he would begin to process Plaintiff's termination with Human Resources ("HR").

101. Mr. Du Preez also joined the meeting, stating that the reason for the demotion or termination options was due to the lack of need for a director position, despite the recent hiring of Mr. Somerville and Ms. Henriquez.

102. On or about August 22, 2025, Plaintiff was officially terminated and asked to return Plaintiff's computer and other belongings to Defendant.

103. At the time Plaintiff was terminated, Plaintiff had upcoming medical appointments and follow-ups related to her vaginoplasty for which she intended to use her FMLA for those future appointments.

**COUNT I**
**AMERICANS WITH DISABILITIES ACT**
42 U.S.C. § 12101, *et seq*.
**DISABILITY DISCRIMINATION, FAILURE TO ACCOMMODATE, AND RETALIATION**

104. Paragraphs 1 through 103 are hereby incorporated by reference as though the same were set forth herein.

105. Defendant had fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the then-current or preceding calendar years applicable to Plaintiff's claims.

106. Defendant is therefore an "employer" as defined and covered by the ADA.

107. At all times relevant hereto, Plaintiff was an employee of Defendant within the meaning of the ADA.

108. Pursuant to the ADA, Plaintiff is a qualified individual with one or more disabilities.

109. Plaintiff's gender dysphoria is a disability within the meaning of the ADA because it substantially limits one or more major life activity, including but not limited to interacting with others, and social and occupational functioning, and it substantially limits one or more major bodily functions, including, but not limited to reproduction and using the restroom.

110. Despite her disability, Plaintiff would have been able to perform the essential functions of her job with or without a reasonable accommodation.

111. Plaintiff requested a reasonable accommodation for her disability in the form of requesting information about the FMLA, using continuous medical leave, and requesting time off to go to her doctor's appointments for her disabilities so that she could perform the essential functions of her position.

112. Defendant failed to engage in an interactive process in good faith with Plaintiff to determine a reasonable accommodation for her disability.

113. Defendant refused to provide Plaintiff with a reasonable accommodation for her disability.

114. Defendant retaliated against Plaintiff because she made a good faith request for a reasonable accommodation for her disability.

115. Plaintiff suffered an adverse employment action, inter alia, by Defendant terminating her employment under circumstances that could give rise to an inference of intentional discrimination on the basis of her disability.

116. By reasons of the foregoing, Defendant, through its agents, officers, servants, and/or employees, has violated the ADA by discriminating against Plaintiff, failing to provide a reasonable accommodation, failing to engage in the interactive process in good faith, retaliating against Plaintiff for requesting a reasonable accommodation, and for terminating Plaintiff because of her disability.

117. As a result of Defendant's deliberate, unlawful, and malicious acts as set forth above, Plaintiff has suffered loss of employment, earnings, raises, other significant economic benefits, and emotional pain and suffering.

**COUNT II**
**PENNSYLVANIA HUMAN RELATIONS ACT**
43 P.S. § 951, *et seq*.
**DISABILITY DISCRIMINATION, FAILURE TO ACCOMMODATE, AND RETALIATION**

118. Paragraphs 1 through 117 are hereby incorporated by reference as though the same were fully set forth at length herein.

119. Defendant had four (4) or more employees at all times applicable to Plaintiff's claims.

120. Defendant is therefore an "employer" as defined and covered by the PHRA.

121. At all times relevant hereto, Plaintiff was an employee of Defendant within the meaning of the PHRA.

122. Pursuant to the PHRA, Plaintiff is a qualified individual with one or more disabilities.

123. Plaintiff's gender dysphoria is a disability within the meaning of the PHRA because it substantially limits one or more major life activity, including but not limited to interacting with

others, and social and occupational functioning, and it substantially limits one or more major bodily functions, including, but not limited to reproduction and using the restroom.

124. Despite her disability, Plaintiff would have been able to perform the essential functions of her job with or without a reasonable accommodation.

125. Plaintiff requested a reasonable accommodation for her disability in the form of requesting information about the FMLA, using continuous medical leave, and requesting time off to go to her doctor's appointments for her disabilities so that she could perform the essential functions of her position.

126. Defendant failed to engage in an interactive process in good faith with Plaintiff to determine a reasonable accommodation for her disability.

127. Defendant refused to provide Plaintiff with a reasonable accommodation for her disability.

128. Defendant retaliated against Plaintiff because she made a good faith request for a reasonable accommodation for her disability.

129. Plaintiff suffered an adverse employment action, inter alia, by Defendant terminating her employment under circumstances that could give rise to an inference of intentional discrimination on the basis of her disability.

130. By reasons of the foregoing, Defendant, through its agents, officers, servants, and/or employees, has violated the PHRA by discriminating against Plaintiff, failing to provide a reasonable accommodation, failing to engage in the interactive process in good faith, retaliating against Plaintiff for requesting a reasonable accommodation, and for terminating Plaintiff because of her disability.

131. As a result of Defendant's deliberate, unlawful, and malicious acts as set forth above, Plaintiff has suffered loss of employment, earnings, raises, other significant economic benefits, and emotional pain and suffering.

**COUNT III**
**FAMILY AND MEDICAL LEAVE ACT**
29 U.S.C. § 2601, *et seq.*
**INTERFERENCE AND RETALIATION**

132. Paragraphs 1 through 131 are hereby incorporated by reference as though the same were fully set forth at length herein.

133. Defendant employed at least fifty (50) employees within the applicable seventy-five (75) mile radius for each working day in each of twenty (20) or more calendar days in the current or preceding year.

134. Plaintiff was an eligible employee under the FMLA and thus was entitled to twelve (12) weeks of unpaid leave and/or intermittent leave to seek treatment for her serious health condition.

135. Plaintiff invoked her right to FMLA-qualifying leave by providing adequate notice to Defendant of her need for medical leave as soon as she became aware of the need for leave and/or as soon as was practicable. See 29 C.F.R. 825.303.

136. Plaintiff provided sufficient information to Defendant on several occasions for it to reasonably determine whether the FMLA may apply to any requests for leave or time off. See 29 C.F.R. § 825.303(b).

137. Defendant willfully violated the FMLA by intentionally and/or with reckless disregard for Plaintiff's rights under the FMLA, denying Plaintiff benefits under the FMLA to which she was entitled and terminating her because she invoked her right to FMLA-qualifying leave.

138. The aforementioned actions of Defendant constitute interference and retaliation under the FMLA.

139. As a result of Defendant's actions, Plaintiff has suffered a loss of employment, earnings, raises, and other significant economic benefits.

**WHEREFORE,** as a result of the unlawful conduct of Defendant, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and grant her the maximum relief allowed by law, including but not limited to:

A. Back wages, front pay, lost benefits, bonuses, and compensatory damages in an amount to be determined at trial;

B. Punitive damages in an amount to be determined at trial;

C. Plaintiff's costs, disbursements, and attorneys' fees incurred in prosecuting this action;

D. Liquidated damages for Defendant's willful violation of the FMLA;

E. Pre-judgment interest in an appropriate amount;

F. Such other and further relief as is just and equitable under the circumstances; and

G. Any verdict in favor of Plaintiff be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages as set forth by applicable law.

**JURY DEMAND**

140. Plaintiff hereby demands a trial by jury as to all issues so triable.

Respectfully submitted,

**MARZZACCO INJURY LAW**
*/S/ Kendyl L. Swank*
Kendyl L. Swank, Esquire
945 East Park Drive, Suite 103
Harrisburg, PA 17111
(717) 231-1640
(717) 231-1650 (fax)
kswank@klnivenlaw.com
*Attorney for Plaintiff*

Dated: September 29, 2026

**DEMAND TO PRESERVE EVIDENCE**

The Defendant is hereby demanded to preserve all physical and electronic information pertaining in any way to Plaintiff's employment, to Plaintiff's potential claims and her claims to damages, to any defenses to same, including but not limited to, electronic data storage, employment files, files, memos, job descriptions, text messages, emails, spreadsheets, images, cache memory, payroll records, paystubs, time records, timesheets, and any other information and/or data which may be relevant to any claim or defense in this litigation.